GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY ALBA and ROBERT BLAZINA JR., individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HARBOR FREIGHT TOOLS USA, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

THE PARTIES ................................................................................................................... 2

JURISDICTION AND VENUE........................................................................................... 3

TOLLING AND RELATED ARBITRATION PROCEEDINGS ............................................ 3

SUBSTANTIVE ALLEGATIONS ...................................................................................... 5

      A.     Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies............................................. 5

      B.     Defendant Falsely Informed Users That They Could Reject the Website's Use of "All" Cookies. ........................................................................... 10

      C.     The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website. ........................................... 18

            1.     The Website Causes the Interception of the Contents of Communications ....................................................................... 18

            2.     Facebook Cookies ............................................................... 21

            3.     Google Cookies ................................................................... 24

            4.     Microsoft Bing Cookies ...................................................... 31

      D.     The Private Communications Collected are Valuable........................... 34

PLAINTIFFS' EXPERIENCES .......................................................................................... 35

CLASS ALLEGATIONS ................................................................................................... 41

CAUSES OF ACTION...................................................................................................... 43

     First Cause of Action: Invasion of Privacy ....................................................... 43

     Second Cause of Action: Intrusion Upon Seclusion ......................................... 45

     Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........................................... 47

     Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................................ 52

     Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ............ 53

     Sixth Cause of Action: Unjust Enrichment ...................................................... 56

PRAYER FOR RELIEF ..................................................................................................... 57

CLASS ACTION COMPLAINT

Plaintiffs Larry Alba and Robert Blazina Jr. (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Harbor Freight Tools USA, Inc. ("Defendant" or "Harbor Freight"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.harborfreight.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject All Cookies" as shown in the following screenshot (which has been stretched to enhance readability):

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting "Reject All Cookies" would only permit cookies during your visit necessary for the functioning of the website.

  

2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "Reject All Cookies," Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics), and Microsoft Corporation (Microsoft Bing) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

CLASS ACTION COMPLAINT

4.    Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.    The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.    This type of tracking and data sharing is exactly what Website visitors sought to avoid when they clicked or selected the "Reject All Cookies" button. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.    Plaintiff Larry Alba is, and was at all relevant times, an individual and resident of Sunnyvale, California. Plaintiff Alba intends to remain in California and makes his permanent home there.

8.    Plaintiff Robert Blazina Jr. is, and was at all relevant times, an individual and resident of Rocklin, California. Plaintiff Blazina Jr. intends to remain in California and makes his permanent home there.

- 2 -

9. Defendant Harbor Freight Tools USA, Inc. is a Delaware corporation with its headquarters and principal place of business in Calabasas, California.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

**TOLLING AND RELATED ARBITRATION PROCEEDINGS**

15. The delayed discovery rule applies to Plaintiff Blazina Jr.'s claims. Plaintiff Blazina Jr. was unaware that even though he rejected all cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until on or around April 17, 2024, when Plaintiff Blazina Jr. learned of Defendant's privacy violations from his counsel. As alleged below, Plaintiffs do not have the expertise to test whether the Website honored users' requests to reject all cookies.

16. On or about June 27, 2024, Plaintiff Blazina Jr. notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding

- 3 -

CLASS ACTION COMPLAINT

data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection of such third-party cookies. Plaintiff Blazina Jr. further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

17.     The Website's Terms of Use contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendants before Judicial Arbitration and Mediation Services ("JAMS").

18.     Accordingly, on November 1, 2024, Plaintiff Blazina Jr. filed a demand for arbitration in San Francisco with JAMS against Defendant. *See* Ex. A. Plaintiff Blazina Jr. sought a declaration from the arbitrator that his claims were not subject to arbitration because he did not assent to the Terms of Use.

19.     Arbitrator Roderick M. Thompson was appointed to the arbitration on February 7, 2025.

20.     The parties fully briefed the issue of arbitrability before the JAMS Arbitrator and a hearing was held on July 9, 2025. Subsequently, Order No. 2 (Dismissal For Lack of Jurisdiction) was issued on July 17, 2025. *See* Ex. B. The arbitrator found that "Claimant Blazina did not agree with Respondent's TOU and a contract was not formed. Therefore, the Arbitrator does not have jurisdiction to decide the Parties' "cookies" dispute under the arbitration clause in the TOU as a result of Blazina's 2023 visits to Website." *Id.* ¶ 24.

21.     JAMS closed the arbitration on August 29, 2025.

22.     Despite exercising reasonable diligence, Plaintiff Blazina Jr. was unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiff from discovering his claims sooner. Further, Plaintiff Blazina Jr.'s claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff Blazina Jr.'s claims since his claims were substantially similar in the demand letter and arbitration proceeding to those asserted in this Complaint. These extraordinary circumstances,

- 4 -

including Defendant's intentional misrepresentations and Plaintiff Blazina Jr.'s pursuit of his claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiff Blazina Jr. to pursue his claims in this forum. Plaintiff Blazina Jr. acted in good faith and engaged in reasonable conduct in filing his Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

23.    Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address , which allows the Website server to identify the origin of the request and return the response.

24.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

25.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

26.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors,

- 5 -

that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

27. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

28. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

29. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, analytics.google.com, www.bing.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

30. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- 6 -

CLASS ACTION COMPLAINT

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

- 7 -
CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32.     Defendant is a tool and hardware retailer that owns and operates a chain of retail stores. Defendant also owns and operates the Website, which allows visitors to receive information about its tool and hardware products, including the retail locations where the products are sold, and purchase such products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

CLASS ACTION COMPLAINT

34.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

When you use our Services or open our emails, we may obtain certain information by automated means, such as cookies, pixel tags, server or device logs, session replay and screen capture technology, and other technologies. A "cookie" is a text file that websites send to a visitor's device to uniquely identify the visitor's browser or to store information or settings in the browser. A "pixel tag"(also known as a web beacon), which is a type of technology that is often used in combination with cookies, is placed on a website or within an email to track certain activity, such as views of a website or when an email is opened. These technologies help us (1) remember your information so you do not have to re-enter it; (2) track and understand how you use and interact with the Services;(3) tailor the Services around your preferences; (4) measure the usability of the Services and the effectiveness of our communications; (5) authenticate your identity, protect against fraud and provide our products and services; and (6) otherwise manage and enhance our products and services, and help ensure they are working properly.

We also may use session replay and screen capture technology to collect, on a real-time basis, information on how you use and navigate the Services. This may include mouse movements, how you scroll through the Services, and certain keystroke information.

We may use these automated technologies on the Services to collect information about your device, browsing actions, and usage patterns. We obtain information about your device and web browser in this manner such as your device IP address, general location information, unique device identifiers, device type and model, device characteristics and settings, browser settings and characteristics, operating system type and version, language and country preferences, battery and signal strength, usage statistics, referring emails and web addresses, and other application details. We also may obtain information about your interactions with our Services, such as pages visited, links clicked, features used, dates and times of usage, session information, and other information about your use of our Services.

…

**We may use the personal information we obtain to:**

- Provide our products and services, manage your accounts, process your orders, ensure proper delivery, process returns, better assist you when you visit or call us as well as to improve our product and service offerings;
- Communicate with you, respond to inquiries and offer customer support;
- Personalize your experience with our products and services;
- Advertise and market our products and services;
- Administer participation in surveys, sweepstakes, promotions or other programs;
- Perform analytics and market, trend or statistical research;
- Operate, evaluate and improve our business (including developing new products and services; improving and analyzing our products and services; managing our communications; and performing accounting, auditing and other internal functions)…

…

- 9 -

CLASS ACTION COMPLAINT

**Third-Party Analytics Services**

We may use third-party analytics services on the Services, such as Google Analytics. We also may use third-party session replay and screen capture services that record users' interactions with the Services. The providers of these analytics services use technologies such as cookies, web beacons, session replay and screen capture technology, and similar automated technologies to help us analyze your use of the Services. The information collected through these means may be disclosed to or collected directly by these services. To learn more about Google Analytics, please visit https://www.google.com/policies/privacy/partners/.

**Interest-Based Advertising**

You may see our ads on other websites because we use third-party ad services on our Services. Through these ad services, we can tailor our messaging to individuals considering demographic data, inferred interests and browsing context. These ad services track information about your online activities over time and across third-party websites and apps by collecting information through automated means, including through the use of cookies, web server logs, web beacons and other similar technologies. These ad services may collect data about your visits to websites and apps that participate in these services, such as the pages or ads you view and the actions you take on the websites or apps. This data collection takes place both on our Services and on third-party websites and apps that participate in these ad services. These ad services use this information to show you ads that may be tailored to your individual interests. This process also helps us track the effectiveness of our marketing efforts. Our Services are not designed to respond to "do not track" signals from browsers.[1]

35.    Defendant further explained the third-party "Targeting Cookies" it used on the Website as follows in cookie settings window (accessible via the "Cookie Settings" link in the popup cookie consent banner):

**Targeting Cookies**

These cookies may be set through our site by companies we work with to advertise our goods and services. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not directly store personal information, but are based on uniquely identifying your browser and internet device.

**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of "All" Cookies.**

36.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the

---

[1] Harbor Freight Privacy Policy (updated 2/14/2024) (available at https://www.harborfreight.com/security-and-privacy.html) (the "Privacy Policy"). On information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Website.

CLASS ACTION COMPLAINT

screenshot below, the cookie consent banner stated "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting 'Reject All Cookies' would only permit cookies during your visit necessary for the functioning of the website." The banner then purported to provide users the opportunity, rather than choosing to "Accept All Cookies" by clicking or selecting the associated button, to instead "Reject All Cookies" by clicking or selecting the button to do so, as shown in the following screenshot from the Website (which has been stretched to enhance readability):

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting "Reject All Cookies" would only permit cookies during your visit necessary for the functioning of the website.    Cookie Settings

37.    Plaintiffs and other Website users who clicked or selected the "Reject All Cookies" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, other than those cookies necessary for the functioning of the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

38.    Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those that used to "analyze performance and traffic on our website" and "share information about your use of our site with our social media, advertising, and analytics partners." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All Cookies" button.

39.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or

selected the "Reject All Cookies" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, even after receiving that notice, Defendant caused the Third Party cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

40.     In particular, when users clicked or selected the "Reject All Cookies" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

41.     Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "Reject All Cookies" button on the Website's popup cookie consent banner:

- 12 -
CLASS ACTION COMPLAINT

- 13 -

- 14 -

CLASS ACTION COMPLAINT

42.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.harborfreight.com. The screenshots depict only network traffic occurring *after* the user rejected all cookies, other than those necessary for the Website to function, using the cookie banner. As shown above, despite the user's rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, analytics.google.com, www.bing.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These

- 16 -

CLASS ACTION COMPLAINT

screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies by clicking or selecting the "Reject All Cookies" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of "All" such cookies.

43.   Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

44.   As users interact with the Website, even after clicking or selecting the "Reject All Cookies" button, thereby declining or rejecting the use of cookies and similar technologies, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

45.   The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When

- 17 -

CLASS ACTION COMPLAINT

the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.  The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website.**

**1.  The Website Causes the Interception of the Contents of Communications**

46.  The Website includes a search bar and other input fields which users enter information. For example, below is a screenshot of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.



47.  When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

48.  Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

49.  For example, the Website causes consumers' search strings to be transmitted to at least Facebook and Google—even after consumers have rejected all non-necessary cookies. In the example below, the test string "hammer" was sent to Facebook and Google along with cookie data:

- 18 -
CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



50.    The Website also offers a feature that allows users to search for a local store by entering location information, enabling the Website to provide information regarding where particular products are sold and their in-store availability. For example, when a user enters "94111" into the "My Store" search field, the Website returns store-specific results reflecting product availability at nearby locations.

CLASS ACTION COMPLAINT



51.    On information and belief, the Website causes the location information entered by users into the store-search feature—communications intended solely for transmission to the Website—to be automatically intercepted by Third Parties in the same manner as user search queries described above.

### 2.    Facebook Cookies

52.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to "Reject All Cookies" other than those necessary for the functioning of the Website. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[2] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

53.    Cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that

---

[2] https://www.facebook.com/privacy/policies/cookies/.

advertisers use to measure ad campaign performance. For example, when the user searches for the term "hammer," Defendant causes the following data to be transmitted to Meta:



54.    The "dl" parameter discloses to Facebook the search term the user entered into the Website: "hammer."

55.    The "ev" parameter denotes to an "event." In this instance, the event is a "PageView"; the user is viewing the page of results corresponding to the search term "hammer."

56.    Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the event data above:

CLASS ACTION COMPLAINT

57.     The "c_user" cookie shown above is the user's unique Facebook ID, and enables Facebook to identify a specific user when they are logged in to their account. The "c_user" value is associated with the user's Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

58.     In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[3] These cookies allow Meta to collect data on how users interact with websites, regardless of whether the user has a Facebook account or is logged in.[4]

59.     Further, all network calls to Facebook contain the user's "user-agent" and IP address.

---

[3] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[4] https://allaboutcookies.org/what-data-does-facebook-collect.

- 23 -

CLASS ACTION COMPLAINT

60.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[5]

61.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

62.     In addition, the Website causes the user's "user-agent" information to be sent to Meta. The user-agent corresponds to the device and browser that the user has used to access the Website.

63.     Finally, the data sent to Meta includes the user's IP address.

**3.     Google Cookies**

64.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users "Reject All Cookies" other than those necessary for the functioning of the Website to and from the **www.google.com**, **analytics.google.com**, and

---

[5] *Id.*

- 24 -

**www.google-analytics.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[6] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[7] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[8]

65.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[9] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

---

[6] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[7] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[8] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[9] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

CLASS ACTION COMPLAINT

66.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[10] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[11]

67.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[12]

68.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com, when a user searches for the term "hammer":

---

[10] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[11] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).
[12] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675569576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

- 26 -

CLASS ACTION COMPLAINT

| gtm | 45je46h0v878826124z876154750za200zb76154 750 |
|---|---|
| npa | 0 |
| pae | 1 |
| pscdl | noapi |
| sct | 1 |
| seg | 1 |
| sid | 1718844165 |
| sr | 1440x900 |
| tag_exp | 0 |
| tfd | 188937 |
| tid | G-L6G2Q997Z9 |
| uaa | arm |
| uab | 64 |
| uafvl | Not%2FA)Brand;8.0.0.0\|Chromium;126.0.6478.61\| Google%20Chrome;126.0.6478.61 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| ul | en-us |
| v | 2 |

69.     The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that allows Google to link the user to their interactions with the website.[13]

70.     The "dl" parameter ("document location") tells Google what webpage the user was viewing on the Website. In this instance, the "dl" parameter discloses to Google the user's search term: "hammer".

71.     The "dt" parameter corresponds to the "document title", which is the title of the page the user was visiting.

_____

[13] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

- 28 -

CLASS ACTION COMPLAINT

72.    The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

73.    Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:



74.    The "__Secure-3PAPISID," "__Secure-3PSID," and "__Secure-APISID" cookies used on the Website are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting. The "1P_JAR" cookie is used by

- 29 -

CLASS ACTION COMPLAINT

google for advertising purposes, on its Google Ads platform.[14] The "NID" cookie is used for Google advertising. According to Google documentation, "[t]he 'NID' cookie is used to show Google ads in Google services for signed-out users."[15]

75. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 126.0.0.0 Safari/537.36 |
|---|---|

76. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

77. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

78. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

79. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show them more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further,

---

[14] See https://business.safety.google/adscookies/.
[15] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[16]

80.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[17] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 4.    Microsoft Bing Cookies

81.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All Cookies" other than those necessary for the functioning of the Website, to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[18] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com

---

[16] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[17] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[18] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

CLASS ACTION COMPLAINT

cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[19] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising." [20] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[21]

82.    Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[22]; gender[23]; age[24] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie. Bat.bing.com keeps this user data for six months.

83.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [25] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your

---

[19]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.
[20] https://help.ads.microsoft.com/#apex/ads/en/56960/1.
[21] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.
[22] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[23] *Id.*
[24] *Id.*
[25] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

- 32 -

advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[26]

84.    For example, when a user browses the Website, the Microsoft Bing code on the Website causes the user's browser to send the following type of cookie data to Microsoft's domain, https://www.bing.com:

| | |
|---|---|
| **GET**  **200** | https://www.bing.com/maps/sdk/mapcor EAUwubt |

**Request** Header Query Body **Cookies** Raw | Summary +

| Key | Value |
|---|---|
| _SS | SID=0121E4B26D4B60D50A8BF0166CCF614D |
| MUID | 04C5D6F33D0C67B91657C26E3C9E665D |
| SRCHD | AF=NOFORM |
| SRCHHPGUSR | SRCHLANG=en |
| SRCHUID | V=2&GUID=0E385750AFD244C98415981E8F573 93C&dmnchg=1 |
| SRCHUSR | DOB=20240620 |

85.    According to Microsoft's documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites [and is] used for advertising, site analytics, and other operational purposes."[27]

86.    Further, all network calls to Microsoft Bing contain the user's "user-agent" and IP address.

87.    Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[28]

---

[26] https://help.ads.microsoft.com/#apex/ads/en/56680/2.
[27] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-list.
[28] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

- 33 -

**D.**      **The Private Communications Collected are Valuable.**

88.      As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

89.      The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular tool and hardware products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

90.      Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader consumer tool and hardware market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

91.      The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[29] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

[29] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 34 -

92.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell their data or the consumer's willingness to pay to protect their information.

93.     By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Larry Alba**

94.    Plaintiff Alba visited the Website to seek information about Harbor Freight's tool and hardware products, while located in California, on one or more occasions during the last four years.

95.    Plaintiff Alba visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Alba is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

96.    When Plaintiff Alba visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject All Cookies" button. Plaintiff Alba viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting 'Reject All Cookies' would only permit cookies during your visit necessary for the functioning of the website." Plaintiff Alba also viewed Defendant's additional representation that, rather than choosing to "Accept All Cookies" by clicking or selecting the button to do so, users could instead "Reject All Cookies" by clicking or selecting the button to do so.

- 35 -

97.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Alba selected and clicked the "Reject All Cookies" button. Plaintiff Alba believed that selecting the "Reject All Cookies" button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies, except those necessary for the functioning of the Website (but inclusive of those cookies that cause the disclosure of tracking data to Defendant's third-party social media, advertising and analytics partners for the purposes of providing advertising and analytics services, among other functions).

98.    In selecting the "Reject All Cookies" button, Plaintiff Alba gave Defendant notice that he did not consent to the use or placement of all cookies and tracking technologies while browsing the Website, other than those necessary for the functioning of the Website. Further, Plaintiff Alba specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic on [the] Website" and share information with third parties, including Defendant's "social media, advertising and analytics partners." In reliance on these representations and promises, only then did Plaintiff Alba continue browsing the Website.

99.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used to analyze performance and traffic on the Website, and those that share information with Defendant's social media, advertising and analytics partners, to be placed on Plaintiff Alba's device and/or transmitted to the Third Parties along with user data, without Plaintiff Alba's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Alba that he could reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Alba believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

100.    Then, as Plaintiff Alba continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Alba's clear

- 36 -

rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in analyzing performance and traffic on the Website and sharing information about Plaintiff Alba's use of the Website with Defendant's social media, advertising, and analytics partners. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Alba's Private Communications as Plaintiff Alba browsed the Website.

101. Defendant's representations that consumers could "Reject All Cookies" while Plaintiff Alba and users browsed the Website, or at least those cookies not necessary for the functioning of the Website and those that are involved in analyzing performance and traffic on the Website, including those cookies that share information about Plaintiff Alba's and users' use of the Website with Defendant's social media, advertising and analytics partners, were untrue. Had Plaintiff Alba known this fact, he would not have used the Website. Moreover, Plaintiff Alba reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Alba would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

102. Plaintiff Alba continues to desire to browse content featured on the Website. Plaintiff Alba would like to browse websites that do not misrepresent that users can reject all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Alba would likely browse the Website again in the future, but will not do so until then. Plaintiff Alba regularly visits websites that feature content similar to that of the Website. Because Plaintiff Alba does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Alba will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to

CLASS ACTION COMPLAINT

determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Alba is not a software developer and has not received training with respect to HTTP network calls.

**Robert Blazina Jr.**

103. Plaintiff Blazina Jr. visited the Website to seek information about Harbor Freight's tool and hardware products, while located in California, on one or more occasions during the last four years, including in or around November 2023.

104. Plaintiff Blazina Jr.'s visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Blazina Jr. is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

105. When Plaintiff Blazina Jr. visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject All Cookies" button. Plaintiff Blazina Jr. viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting 'Reject All Cookies' would only permit cookies during your visit necessary for the functioning of the website." Plaintiff Blazina Jr. also viewed Defendant's additional representation that, rather than choosing to "Accept All Cookies" by clicking or selecting the button to do so, users could instead "Reject All Cookies" by clicking or selecting the button to do so.

106. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Blazina Jr. selected and clicked the "Reject All Cookies" button. Plaintiff Blazina Jr. believed that selecting the "Reject All

Cookies" button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies, except those necessary for the functioning of the Website (but inclusive of those cookies that cause the disclosure of tracking data to Defendant's third-party social media, advertising and analytics partners for the purposes of providing advertising and analytics services, among other functions).

107. In selecting the "Reject All Cookies" button, Plaintiff Blazina Jr. gave Defendant notice that he did not consent to the use or placement of all cookies and tracking technologies while browsing the Website, other than those necessary for the functioning of the Website. Further, Plaintiff Blazina Jr. specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic on [the] Website" and share information with third parties, including Defendant's "social media, advertising and analytics partners." In reliance on these representations and promises, only then did Plaintiff Blazina Jr. continue browsing the Website.

108. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used to analyze performance and traffic on the Website, and those that share information with Defendant's social media, advertising and analytics partners, to be placed on Plaintiff Blazina Jr.'s device and/or transmitted to the Third Parties along with user data, without Plaintiff Blazina Jr.'s knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Blazina Jr. that he could reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Blazina Jr. believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

109. Then, as Plaintiff Blazina Jr. continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Blazina Jr.'s clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user

- 39 -

CLASS ACTION COMPLAINT

data, including those involved in analyzing performance and traffic on the Website and sharing information about Plaintiff Blazina Jr.'s use of the Website with Defendant's social media, advertising, and analytics partners. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Blazina Jr.'s Private Communications as Plaintiff Blazina Jr. browsed the Website.

110.    Defendant's representations that consumers could "Reject All Cookies" while Plaintiff Blazina Jr. and users browsed the Website, or at least those cookies not necessary for the functioning of the Website and those that are involved in analyzing performance and traffic on the Website, including those cookies that share information about Plaintiff Blazina Jr.'s and users' use of the Website with Defendant's social media, advertising and analytics partners, were untrue. Had Plaintiff Blazina Jr. known this fact, he would not have used the Website. Moreover, Plaintiff Blazina Jr. reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all unnecessary cookies, Plaintiff Blazina Jr. would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

111.    Plaintiff Blazina Jr. continues to desire to browse content featured on the Website. Plaintiff Blazina Jr. would like to browse websites that do not misrepresent that users can reject all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Blazina Jr. would likely browse the Website again in the future, but will not do so until then. Plaintiff Blazina Jr. regularly visits websites that feature content similar to that of the Website. Because Plaintiff Blazina Jr. does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all unnecessary cookies and tracking technologies, Plaintiff Blazina Jr. will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to

- 40 -

third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Blazina Jr. is not a software developer and has not received training with respect to HTTP network calls.

## **CLASS ALLEGATIONS**

112.   Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the United States after clicking or selecting the "Reject All Cookies" button in the popup cookies consent banner.

113.   This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

114.   **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

115.   **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all unnecessary cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

CLASS ACTION COMPLAINT

116.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

117.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

118.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

119.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

- 42 -

CLASS ACTION COMPLAINT

and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## **CAUSES OF ACTION**

### **First Cause of Action: Invasion of Privacy**

120. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

121. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

122. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

123. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All Cookies" and tracking technologies, other than those necessary for the functioning of the Website, before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected unnecessary cookies and reasonably expected that their rejection of unnecessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send

cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

124. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

125. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

- 44 -
CLASS ACTION COMPLAINT

126. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

127. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

128. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

129. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

130. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

131. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### **Second Cause of Action: Intrusion Upon Seclusion**

132. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

133. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

134. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

135. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All Cookies" other than those necessary for the functioning of the Website.

136. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject All Cookies" other than those necessary for the functioning of the Website, as well as state criminal and civil laws designed to protect individual privacy.

137. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All Cookies" when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all unnecessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private

Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

138. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

139. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

140. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

141. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

142. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

143. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

- 47 -

CLASS ACTION COMPLAINT

144.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

145.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

146.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did **any** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

147.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

- 48 -
CLASS ACTION COMPLAINT

148.    Defendant is a "person" within the meaning of California Penal Code § 631.

149.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

150.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

151.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

152.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

153.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

- 49 -

CLASS ACTION COMPLAINT

information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

154. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

155. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

156. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

157. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept,

- 50 -

read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject unnecessary cookies in the consent banner.

158. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

159. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

160. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

161. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to hardware and tool products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject

CLASS ACTION COMPLAINT

unnecessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

162.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

163.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

164.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

165.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

166.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

- 52 -
CLASS ACTION COMPLAINT

167. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

168. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

169. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "Reject All Cookies" button in the cookie consent banner.

170. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

171. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

172. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

173. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

174. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All Cookies[,]" including those that analyze performance and traffic on Defendant's Website and share information about Plaintiffs' and Class members' use of the

- 53 -

CLASS ACTION COMPLAINT

Website with Defendant's social media, advertising, and analytics partners, but excepting those cookies necessary for the functioning of the Website.

175. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Reject All Cookies" button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All Cookies."

176. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Reject All Cookies", which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

177. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

178. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their

- 54 -

CLASS ACTION COMPLAINT

browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

179.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

180.    Defendant's representation that consumers could reject unnecessary cookies (including those that analyze performance and traffic on the Website and share information about Plaintiffs' and Class Members' use of the Website with Defendant's social media, advertising, and analytics partners) if they clicked or selected the "Reject All Cookies" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused unnecessary third-party non- cookies to be stored on Website visitors' devices that are related to Website traffic analysis and/or share information with third parties, including Defendant's social media, advertising, and analytics partners, even after they choose to reject all such unnecessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

181.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject unnecessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

182. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

183. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

184. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

<b><u>Sixth Cause of Action</u>: Unjust Enrichment</b>

185. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

186. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

187. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All Cookies" and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected all such cookies.

188. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

189. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

190. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were

- 56 -

CLASS ACTION COMPLAINT

the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

191. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

192. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

193. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

194. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: February 2, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

- 58 -
CLASS ACTION COMPLAINT

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

**JAMS**

**SAN FRANCISCO REGIONAL OFFICE**

| | |
|---|---|
| ROBERT BLAZINA JR., | Arbitration Case No. |
| Claimant, | **COMPLAINT AND DEMAND FOR ARBITRATION** |
| v. | |
| HARBOR FREIGHT TOOLS USA, INC., | |
| Respondent. | |

Claimant Robert Blazina Jr. ("Claimant") brings this action against Harbor Freight Tools USA, Inc. ("Respondent" or "Harbor Freight"). Claimant's allegations against Harbor Freight are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge. Claimant files this Complaint and Demand for Arbitration without waiver of any right or argument, specifically, and without limitation, that he did not assent to the Harbor Freight website's Terms and Conditions of Use, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

**INTRODUCTION**

1.     This Complaint and Arbitration Demand concerns one issue: whether a valid and enforceable arbitration agreement was formed between the parties to cover a separate dispute about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

- 1 -

Respondent's website (www.harborfreight.com, the "Website"), where, despite Claimant's agreement with Respondent that it would not place tracking cookies on his device, Respondent proceeded to do so anyway. As is relevant to the instant dispute, the Website also contains Terms and Conditions of Use ("TOU" or "Terms") with an arbitration provision purporting to require "ANY AND ALL DISPUTES" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Respondent contends that the arbitration provision in the TOU is applicable to the underlying dispute and refused to consent to litigate the underlying dispute in federal court. Accordingly, he filed this arbitration demand to seek a declaration from the arbitrator that his underlying cookie dispute with Respondent is not subject to arbitration.

2. The Website's TOU are available on the Website but are accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3. When Claimant visited the Website, he did not see or otherwise assent to the TOU before choosing to "Reject All Cookies" and browse the website. Accordingly, Claimant made no agreement to arbitrate his underlying cookie dispute.

### BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4. This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5. However, at least until placed on notice by Claimant,[1] the Website presented all visitors immediately with a popup cookies consent banner stating that "[t]he website uses cookies to enhance user experience and to analyze performance and traffic on our website. We

---

[1] On or about June 27, 2024, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq.*, and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq.*

also share information about your use of our site with our social media, advertising and analytics partners. Selecting 'Reject All Cookies' would only permit cookies during your visit necessary for the functioning of the website." Accordingly, these representations are accompanied by a button labelled "Reject All Cookies[,]" indicating that, rather than accepting all cookies, users can click this button to reject all cookies other than those necessary for the function of the Website.



(Screenshot of the Harbor Freight website's cookies popup banner at the time of Claimant's visit.)

6.      Selecting or clicking the "Reject All Cookies" button indicates users' choice/agreement to reject all cookies other than those necessary for the functioning of the Website.  Thousands of visitors to the Website, including Claimant, did just that—they selected or clicked the "Reject All Cookies" button to indicate their choice/agreement to reject all cookies, including those cookies responsible for the sale or sharing of users' personal information with third parties such as Respondent's social media, advertising, and analytics partners (other than those necessary for the functioning of the Website), and then proceeded to browse the Website.

7.      Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Google, Facebook, and Microsoft/Bing—to be stored on the devices and browsers of Claimant and those similarly situated, despite their rejection of all such cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Respondent brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

COMPLAINT AND DEMAND FOR ARBITRATION

## PARTIES

8.     Claimant Robert Blazina Jr. is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

9.     Respondent Harbor Freight Tools USA, Inc. is a Delaware corporation with its headquarters and principal place of business in Calabasas, California. Respondent does substantial business in many U.S. states, including California, through its Website, and otherwise.

## SUBSTANTIVE ALLEGATIONS

### A.     Respondent's Unenforceable Browsewrap Agreement.

10.     Respondent's Website includes a TOU that purports to govern the use of the Harbor Freight Website. *See* TOU ("This site and other sites that may currently exist and/or be established by Harbor Freight…are governed by these Terms and Conditions of Use"). It is located at the following address: https://www.harborfreight.com/terms-and-conditions.

11.      The section of the TOU titled "CHOICE OF LAW; JURISDICTION" purports to require Website users to arbitrate all disputes with Respondent in JAMS. *See* TOU ("ANY AND ALL DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING ARBITRATION...Your rights will be determined by a neutral arbitrator, NOT a judge or jury. You agree that any dispute arising out of or relating to these Terms, including with respect to the interpretation of any provision of these Terms or other agreements between you and us, or concerning the performance or obligations of you and us, shall be resolved by mandatory binding arbitration submitted to JAMS, formerly known as Judicial Arbitration and Mediation Services, Inc. ('JAMS')[.]")

12.     Further, the TOU, in calling for the arbitration of "any dispute arising out of or relating to these Terms, including with respect to the interpretation of any provision of these Terms or agreements between you and us" purports to grant exclusive authority to the arbitrator to determine whether an agreement to arbitrate was formed.

COMPLAINT AND DEMAND FOR ARBITRATION

13.    Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the TOU, or even the hyperlink to the TOU (labeled "Terms & Conditions"), and thus had no actual notice that his continued browsing of the Website would be subject to an arbitration agreement.

14.    Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested his assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

15.    When users visited the Website, Respondent immediately displayed to them a popup cookie consent banner that prompted users to either "Accept All Cookies," "Reject All Cookies," or otherwise configure their "Cookie Settings." The popup cookie consent banner remains displayed until users make a selection on the banner. The popup banner made no mention of the Website's TOU, contained no link to the TOU, and did not require the user to manifest assent to the Terms, as shown in the following screenshot:

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Selecting "Reject All Cookies" would only permit cookies during your visit necessary for the functioning of the website.    Cookie Settings    Reject All Cookies    Accept All Cookies

(Screenshot of the cookies popup banner at the time of Claimant's visit with no link to the TOU.)[2]

16.    The only link to the TOU appeared in small font (identical to the surrounding font) at the bottom of the Website, following all the Website's main content, as shown in the following screenshot:

_____

[2] As of November 1, 2024, Respondent's popup cookie consent banner contains a link to the TOU. This link did not appear in the banner at the time of Claimant's visit to the Website and rejection of cookies.

- 5 -
COMPLAINT AND DEMAND FOR ARBITRATION



(Screenshot of the Harbor Freight website showing the placement of the link to the TOU, labeled "Terms & Conditions," at the very bottom of the Website.)

17.     After making their selection on the popup cookies consent banner, users could then continue to browse the Website, as the popup banner disappeared.

18.     The link to the TOU itself at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms.

19.     Respondent never required Claimant to manifest consent to the TOU. Respondent purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B.     Claimant's Experiences**

20.     During the last year, Claimant visited the Harbor Freight Website to browse products.

COMPLAINT AND DEMAND FOR ARBITRATION

21.    When Claimant visited the Harbor Freight Website, the Website immediately presented him with Respondent's cookies popup banner as it appeared at the time.

22.    Consistent with his typical practice in rejecting cookies and/or the sale or sharing of his personal information, Claimant selected and clicked the "Reject All Cookies" button, thereby giving Respondent notice that he did not consent to the use or placement of third-party cookies. Further, Claimant specifically rejected those cookies responsible for the sale or sharing of users' personal information with third parties, including, but not limited to, Respondent's social media, advertising, and analytics partners. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

23.    Claimant did not see the TOU link (labeled "Terms & Conditions")—or the actual Terms—on the Website prior to rejecting all cookies, or at any point thereafter.

## CAUSE OF ACTION

### Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration

24.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

25.    The Harbor Freight website's TOU purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU states the following:

> **CHOICE OF LAW; JURISDICTION**…ANY AND ALL DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING ARBITRATION...Your rights will be determined by a neutral arbitrator, NOT a judge or jury. You agree that any dispute arising out of or relating to these Terms, including with respect to the interpretation of any provision of these Terms or other agreements between you and us, or concerning the performance or obligations of you and us, shall be resolved by mandatory binding arbitration submitted to JAMS, formerly known as Judicial Arbitration and Mediation Services, Inc. ('JAMS')
>
> …
>
> **Class-Action Waiver[.]** Any arbitration, claim, or other proceedings by or between you and us shall be conducted on an individual basis and not through any class action, mass action, or on a consolidated or representative basis. You further agree that the arbitrator shall have no authority to award class-wide relief

- 7 -

COMPLAINT AND DEMAND FOR ARBITRATION

or to combine or aggregate similar claims or unrelated transactions. You acknowledge and agree that this agreement specifically prohibits you from commencing arbitration proceedings as a representative of others.

*See* TOU (available at https://www.harborfreight.com/terms-and-conditions).

26.     Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

27.     The link to the TOU was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that his continued use of the Website would subject him to the TOU.

28.     Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

29.     Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

30.     Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

31.     An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

32.     For reasonable attorneys' fees and the costs incurred; and

33.     For such further relief as may be just and proper.

Dated: November 1, 2024

COMPLAINT AND DEMAND FOR ARBITRATION

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

COMPLAINT AND DEMAND FOR ARBITRATION

# EXHIBIT B

Roderick M. Thompson, Esq.
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA  94111
Telephone: (415) 774-2611
Fax: (415) 982-5287

Arbitrator

**JAMS**

ROBERT BLAZINA JR.,

          Claimant,

    v.

HARBOR FREIGHT TOOLS USA, INC.,
         Respondent.

Reference No.:  **5100002554**

**ORDER NO. 2 (Dismissal For Lack of Jurisdiction)**

The arbitration hearing was conducted via Zoom in this matter on July 9, 2025, pursuant to written notice and the JAMS Comprehensive Arbitration Rules & Procedures (the "Rules").[1] See Notice of Rescheduled Hearing, dated April 23, 2025.

    1.    **Preliminary Matters.**  The Parties to this arbitration are identified in the caption and were represented at the hearing as follows:

For Claimant, Robert Blazina, Jr.
ANTHONY PATEK (State Bar No. 228964)
anthony@gutridesafier.com
seth@gutridesafier.com
GUTRIDE SAFIER LLP

For Respondent, Harbor Freight Tools USA, Inc. ("Harbor Freight")
ISABELLE L. ORD (SBN 198224)
isabelle.ord@us.dlapiper.com
OLIVER M. KIEFER (SBN 332830)
oliver.kiefer@us.dlapiper.com
DLA PIPER LLP (US)

---

[1]  The Arbitrator pointed out to the Parties that Order No. 1 mistakenly referred to "JAMS *Consumer* Arbitration Rules and Procedures," which do not exist.  Preamble, line 2.  That should have read "JAMS *Comprehensive* Arbitration Rules & Procedures."

1

2.      The Parties were given the opportunity to present evidence by testimony and/or exhibits at the hearing.  Both Parties declined and confirmed their agreement to rely on their briefing and accompanying declarations.  At the outset of the hearing, the Parties reported that they had reached a factual stipulation regarding arbitrability, including the authenticity of some of the documents attached to their declarations, that would be finalized and submitted to the Arbitrator shortly.  The Parties filed a document entitled Stipulated Facts Regarding Arbitrability on July 15, 2025.  ("Stip. Facts").

3.      **The Pleadings.**  Claimant's Complaint and Demand for Arbitration dated November 1, 2024 (the "Demand") asserts a single claim, seeking "Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration."  Respondent filed its Answer on March 31, 2025.

4.      The Parties did not agree initially that the claim in the Demand itself is arbitrable. They continue to disagree on whether they have agreed that the Terms and Conditions of Use ("TOU") available to users on Respondent Harbor Freight's website created a valid agreement to arbitrate some or all of their disputes.  At the preliminary conference, the Parties agreed that the arbitration "shall be construed and interpreted in accordance with the laws of the state of California."  Order No. 1 ¶6.

5.      On May 12, 2025, Claimant filed a motion seeking a ruling that "no agreement to arbitrate was ever formed by the Parties," asking for a finding by the "Arbitrator of no-jurisdiction."  The Motion was supported by Declarations of Mr. Blazina and counsel. Respondent filed its Response Brief on June 11, 2025, asking the Arbitrator to "find Claimant's dispute is arbitrable, and deny Claimant's effort to escape the arbitration he himself voluntarily initiated."  At 11.  Claimant filed a Reply on June 30, 2025 supported by a "Supplemental" declaration of Mr. Blazina.  Finally, by agreement with Claimant and approval of the Arbitrator, Respondent filed a Sur-Reply on July 2, 2025.

6.      The Arbitrator is thus confronted with a demand for arbitration that seeks to be limited to the sole claim for a declaration by the Arbitrator that there is no valid agreement between the Parties to arbitrate their underlying dispute.  Respondent has countered by arguing that the very act of filing and pursuing this arbitration has resulted in Claimant conceding that he has now agreed to arbitrate all disputed issues.

7.      **Procedural Posture and Unusual Nature of Dispute.**  In this arbitration, the Claimant (the party who initiated the arbitration by filing the Demand) seeks a ruling that the Arbitrator has no jurisdiction over the Parties' underlying dispute.  He claims that there is arbitrable jurisdiction over his Demand based on an unidentified agreement between the parties, and simultaneously that he never agreed to Respondent's TOU that includes an agreement to arbitrate disputes.  Respondent, on the other hand, contends that the underlying dispute is subject to arbitrable jurisdiction based on the facts that Claimant initiated this arbitration and participated in the litigation process necessary to obtain this decision on the sole claim asserted in his Demand.  In short, Respondent contends that the acts of filing and pursuing a demand for a ruling that there is no arbitral jurisdiction form the basis for jurisdiction.

2

8.      The Demand carefully states several times that Claimant seeks only a finding that the "underlying dispute" is not subject to arbitration.[2]  The underlying dispute, however, is described in the Demand:  Mr. Blazina visited Respondent's Website in 2023.  He was immediately met with a pop-up banner asking him to elect whether to reject or allow "All Cookies" by clicking a corresponding button.  See "Background on the Underlying Cookie Dispute"  ¶¶4, 7 and 15-16; Stip Facts ¶15.  Mr. Blazina never saw an inconspicuous link at the bottom of a website page above the cookies banner for "Terms & Conditions" (the "TOU").  Demand, ¶¶ 13-17.  He never clicked on the TOU.  He did not notice it because it was in small font and inconspicuous, it did not put him on inquiry notice.  At ¶¶ 18-19. 23, 26-29.

9.      The Demand states a single claim for relief: a declaration that Mr. Blazina is not bound by the arbitration agreement in the TOU and is free to pursue his "cookies" claim in court.  The immediate issue raised by the Demand is whether or not Claimant entered into the TOU Agreement proposed on Respondent's website.  This theory of alleged contract formation allegedly asserted by Respondent, as interpreted by the Demand, is that by clicking the box to "Reject All Cookies," Blazina accepted the TOU and is bound by those terms, including the agreement to arbitrate.  Claimant focused on this theory in his motion.

10.      Respondent, however, had earlier asserted affirmative defenses in its Answer:

By invoking the jurisdiction of JAMS in filing the Demand and prosecuting this arbitration Claimant concedes acceptance of the Terms [TOU] and that the claim is arbitrable, consents to the jurisdiction of JAMS and individual arbitration, has released, waived, accepted, affirmed, ratified, and/or is estopped from controverting the agreement to arbitrate, and may not contest the arbitration provision or jurisdiction of JAMS to arbitrate this dispute.  See ¶ 6.

11.      These defenses do not rely on the assertion that Claimant agreed to the arbitration agreement in the TOU by visiting the website.  They are based on the theory that by the acts of filing and pursuing his Demand for arbitration, Claimant is now bound to arbitrate.  In the Reply and during oral argument, counsel for Claimant asserted that the Parties had agreed that the Arbitrator should determine the "threshold" issue of arbitrability or jurisdiction raised by the claim in his Demand, but no more.  He apparently does not contend that this agreement to arbitrate his claim arises from the TOU (that he claims he never saw on the website and is not binding on him).  At oral argument, Claimant's counsel contended that there is "an implied agreement" to arbitrate only the threshold issue of whether there is jurisdiction to arbitrate the underlying "cookies "dispute.  Respondent countered in its Sur-Reply and during oral argument that there is an agreement (by waiver, estoppel, and/or ratification) to arbitrate *all* disputes between the parties, including both threshold jurisdictional issues and the underlying "cookies" dispute.  Respondent does not agree that any agreement to arbitrate is limited to arbitrability issues.

---

[2] In the opening paragraph of his Demand, Blazina states: "Claimant files this Complaint and Demand for Arbitration without waiver of any right or argument, specifically, and without limitation, that he did not assent to the Harbor Freight website's Terms and Conditions of Use, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable."  Demand, ¶ 1; Stip. Facts, ¶¶11-13.

3

12.     **Preliminary Matters.**  Typically, the party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, which, in most instances, is the defendant/respondent. (*See Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)  In addition, the party opposing arbitration is typically entitled to the benefit of all reasonable doubts and inferences. (*See Sifuentes v. Dropbox, Inc*. (N.D. Cal. June 29, 2022) No. 20-CV-07908-HSG, 2022 WL 2673080, at *3.) But here, Respondent is not technically seeking to compel arbitration because Claimant has already submitted an arbitration demand.  It is not clear if the aforementioned inferences and burdens of proof apply to this situation.  Similarly, it is not apparent whether California or Federal law applies to the issues presented in the Demand.  As noted, both the TOUs and Procedural Order No. 1 state that California substantive law applies.

13.     It is normally for the courts, not the arbitrator, to determine the question of jurisdiction and arbitrability unless the parties delegated threshold arbitrability questions to the arbitrator "clearly and unmistakably." (*See Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. 63, 69; *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413 [holding that contracting parties may reserve to the arbitrator exclusive authority to determine gateway issues of arbitrability, but only if there is clear and unmistakable evidence of such agreement].)  Before referring a dispute to an arbitrator, however, the court ordinarily must first determine whether a valid arbitration agreement exists. (*Id*.)  If a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue. (*Id*.)  If a contract is silent or ambiguous about the arbitrator's power in this regard it cannot satisfy the clear and unmistakable evidence standard, thereby leaving the arbitrability question up to the court. (*Greenspan*, *supra*, 185 Cal.App.4th 1413.)

14.     As Claimant argues in its Reply, the "parties can agree to arbitrate "gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate. . . An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  He also points to Rule 11(b) that gives the Arbitrator "the authority to determine jurisdiction and arbitrability issues."  This includes "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought." *Id.*  Claimant concedes that by filing the Demand, he "has agreed to be bound by the Arbitrator's ruling on arbitrability.  If the Arbitrator finds an agreement was formed, Claimant will be required to bring that [cookies dispute] claim in this forum."  Reply at 6.  Claimant recognized that if his cookies dispute claim is arbitrable, it would require him to amend his "Demand to include additional facts and claims." *Id*.

15.     Respondent is equally unequivocal in asserting that the Parties have agreed that the Arbitrator should determine arbitrability (i.e., the claim in the Demand).  At oral argument, counsel for Respondent explained its view that the Arbitrator should decide both arbitrability and the entire dispute between the Parties.  In its briefing Respondent explained that "When Claimant voluntarily initiated this arbitration pursuant to Harbor Freight's Terms, Harbor Freight agreed to arbitrate the entire dispute Claimant submitted to this tribunal in reliance on Claimant's assertion that there was an agreement to arbitrate." Sur-Reply.  At 4.  Respondent's Sur-Reply concludes

4

with the prayer that "the Arbitrator should find Claimant's dispute is arbitrable, and deny Claimant's effort to escape the arbitration he himself voluntarily initiated."  At 6.

16.     The Arbitrator concludes that by their conduct and their oral and written representations to the Arbitrator, the Parties have agreed that the Arbitrator should determine the arbitrability issue set forth in the Demand.  They also agree that if the Arbitrator were to determine that their underlying "cookies" dispute is arbitrable, the Arbitrator would have jurisdiction to decide that dispute on the merits.  Given the unequivocal statements quoted above, the Arbitrator finds that "the parties delegated [the] threshold arbitrability question[] to the arbitrator 'clearly and unmistakably.'" *See Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. 63, 69.  The fact that the Parties disagree strongly on whether they also have agreed to arbitrate the merits of their underlying "cookies" dispute does not undermine their clear and unequivocal agreement to arbitrate the threshold jurisdiction issue set forth in the Demand.

17.     **Sole Issue--Jurisdiction.**  The Arbitrator has carefully reviewed the Parties' somewhat evolving arguments on the jurisdiction issue.  They can be divided into two general categories.  First, Claimant's original argument was straightforward—he never saw the TOU and never agreed to enter a contract with Respondent Harbor Freight.  Therefore, he did not agree to a contract with an arbitration clause.[3]  Second, Harbor Freight relies primarily on its affirmative defense theories—that by the acts of filing and pursuing this arbitration and seeking relief from the Arbitrator (albeit for a single declaratory relief claim that he did not agree to the TOU or its arbitration clause) Claimant has voluntarily submitted to be bound by the results of this arbitration.  As will be seen below, the dividing line between these two arguments, as well as what is meant by the threshold jurisdiction issue, can become murky.

18.     **Did Claimant agree to the TOU, including its arbitration agreement, by visiting the website in 2023?**  In order to form a contract, including an agreement to arbitrate, the parties must manifest their mutual assent to the terms of the agreement.  Mutual assent, or consent, of the parties "is essential to the existence of a contract," (Cal.Civ.Code §§1550, 1565), and consent is not mutual, unless the parties agree upon the same thing in the same sense. (Cal.Civ.Code §1580).  "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.  The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.  If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 460-61 [cleaned up].)

19.     This "principle of knowing consent applies with particular force to provisions for arbitration, including arbitration provisions contained in contracts purportedly formed over the internet." (*Id*. [cleaned up].)  In the context of an internet transaction, "in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website— including, for example, checking boxes and clicking buttons—but any such action must indicate

---

[3]  The Parties have stipulated that Respondent "has not identified a user account or loyalty account associated with Claimant's name, address, email, or phone number."  Stip.Facts ¶30

5

the parties' assent to the same thing, which occurs only when the website puts the consumer on constructive notice of the contractual terms.  Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." (*Id.* at 461[cleaned up].) "The full context of any transaction is critical to determining whether any particular notice is sufficient to put a consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page." (*Id.* at 453.)

20.    The Parties have stipulated that Mr. Blazina visited www.harborfreight.com (the "Website") in November 2023. Stip. Facts ¶1. The Website at that time looked like the example page shown at page 4 of Blazina's Motion  (See Stip. Facts ¶¶3-6), not the example shown by Respondent in its Response brief at page 9, since that page first appeared on the Website around October 31, 2024.  Stip. Facts ¶9.  In his Supplemental Declaration Claimant testified that he has not visited the Website again since December 2023.  Stip.Facts ¶29..  The pre-October 31, 2024 version is most similar to a "browsewrap" agreement, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. (*See Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1177; *Weeks v. Interactive Life forms, LLC* (2024) 100 Cal.App.5th 1077, 1085.)  Courts are generally reluctant to enforce browsewrap agreements because such agreements do not require the user to take any unambiguous action to agree to the terms of use and instead operate under the theory that the user accepts a website's terms of use merely by browsing the site. (*See Berman v. Freedom Fin Network, LLC* (9th Cir. 2022) 30 F.4th 849, 856; *Sellers*, *supra*, 73 Cal.App.5th at 463.)

21.    In *Nguyen*, the defendant's website included a "'Terms and Conditions' link . . . either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away.  On some pages, the content of the webpage is compact enough that a user can view the link without scrolling.  On the remaining pages, the hyperlink is close enough to the 'Proceed with Checkout' button that a user would have to bring the link within his field of vision in order to complete his order." (*Nguyen*, 763 F.3d at 1178.)  The Ninth Circuit concluded that the links were still insufficiently prominent to place the plaintiff on constructive notice of the terms of use. (*Id.*)  The court reasoned that "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.  Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." (*Id.* at 1179.)

22.    In *Long v. Provide Com., Inc.* (2016) 245 Cal.App.4th 855, the California Court of Appeals agreed with the Ninth Circuit's analysis in *Nguyen*, explaining "that, to establish the enforceability of a browsewrap agreement, a textual notice should be required to advise consumers that continued use of a Web site will constitute the consumer's agreement to be bound by the Web site's terms of use." (*Id.* at 867 [citing *Nguyen*, *supra* ,763 F.3d at 1178-79].)  The *Long* court concluded that the party was not on inquiry notice of the browsewrap agreement because the hyperlinks to the terms of use were so difficult to find. (*Id* . at 863.) They were at the bottom of the webpage beneath multiple layers of footers and were displayed in a green typeface that "could blend in with the . . . site's lime green background." (*Id.* at 866.)

6

23.     While Respondent's TOU were hyperlinked at the bottom of every page through its "Terms & Conditions" link, to reach that link, Blazina would have had to scroll to the very bottom of the page.  Stip. Facts ¶¶5-6.  Further, the "Terms and Conditions" link was the same color, same font and font size as the surrounding text, and it appears below all the main content of the Website.  Stip. Facts ¶3-6, citing Safier Declaration.).  The Arbitrator concludes that this was insufficient to have placed Blazina on "inquiry notice" of the TOU and the arbitration provision therein.  The TOU link that would have bound Blazina was not "reasonably conspicuous," and Blazina was not required to (nor did he) take some action, such as clicking a button or checking a box, that unambiguously manifested his assent to the TOU terms. (*See Berman*, *supra*, 30 F.4th at 856).

24.     Accordingly, the Arbitrator finds that Claimant Blazina did not agree with Respondent's TOU and a contract was not formed.  Therefore, the Arbitrator does not have jurisdiction to decide the Parties' "cookies" dispute under the arbitration clause in the TOU as a result of Blazina's 2023 visits to Website.

25.     **Did Claimant's conduct result in his acceptance of the TOU Agreement to arbitrate?**  As summarized above, Respondent's affirmative defenses assert several arguments based on Claimant's conduct in filing and pursuing this demand for arbitration with JAMS he has agreed to arbitration with Respondent.  They are separately addressed below.

26.     Respondent's first argument in response to Claimant's Motion rests on an estoppel theory.  Specifically, Respondent contends that "Claimant affirmatively consented to arbitration by representing to JAMS that he had an agreement to arbitrate with Harbor Freight when he filed his Demand Submission Form and identified Harbor Freight's Terms as the agreement to arbitrate.  The existence of an arbitration agreement was required for JAMS to commence the arbitration, and Claimant provided one.  He is now estopped from repudiating the agreement he relied on to initiate arbitration." (Resp. Response Br., p.2.)

27.     Estoppel, under California law, includes the essential elements of "false statements or concealments, or conduct amounting thereto with reference to the transaction made by one who has actual or virtual knowledge of the facts, to another who is ignorant of the truth, with the intention, resulting in consummation, that the other should act on such false statements or concealments, or equivalent conduct."  (Bruce v. Jefferson Union High School Dist. of San Mateo County (1962) 210 Cal.App.2d 632.)

28.     Respondent was not "ignorant of the truth" in this instance since Blazina clearly stated in the opening paragraph of his Demand that his Demand was submitted "without waiver of any right or argument . . . that he did not assent to the Harbor Freight website's Terms and Conditions of Use, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable."  Demand Preamble lines 19-22.  Respondent therefore knew that Blazina was not waiving his rights to make this argument.  Respondent's estoppel argument lacks merit.

29.     Respondent also maintains that: "Claimant materially participated in the arbitration, including selecting an Arbitrator, attending a case management hearing, engaging in this briefing, and incorporating his underlying claims into his arbitration demand.  Claimant cannot now attempt to sever the merits of the dispute from arbitration." (Resp. p.2.)  But not only did Blazina clearly indicate in the first paragraph of the Demand that, by filing his Demand, he was not waiving his argument that he did not assent to the TOU; but also, the Demand does not seek relief based on Blazina's underlying claim.  Further, the underlying claim (the "cookies" dispute) to which Respondent refers is termed a "separate dispute" by Blazina at paragraph 1 of the Demand, plainly indicating it is not part of the Demand.  As Claimant acknowledges, if it were found that Blazina did assent to the TOU, Blazina would then have to request leave to submit an amended demand in order to address the "separate dispute" of the "underlying claim." Reply at 6.  The "underlying claim" referred to in the Demand is not included in the relief sought by the Demand as it currently stands.

30.     Waiver is an "intentional relinquishment or abandonment of a known right." (*California-American Water Co. v. Marina Coast Water Dist.* (2022) 86 Cal.App.5th 1272, 1292.)  Whether a waiver has occurred is a question of fact; waiver always rests upon intent. (*Id*.) The intention may be expressed, based on the waiving party's words, or implied, based on conduct that is "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." (*Id*.)  Respondent contends that: "Claimant waived any arbitrability challenge because he voluntarily initiated and prosecuted this arbitration." (Resp. Response, p.2.)

31.     For the reasons discussed above, however, it cannot be said that Blazina intentionally relinquished or abandoned a known right when he submitted his Demand.  Instead, he expressly stated in his Demand that he was not waiving his right to argue that he did not assent to the TOU.[4]  The cases cited by Respondent in its brief are inapposite to these proceedings.  For example, in *Nghiem v. NEC Electronics, Inc.* (1994) 25 F.3d 1437, the court found there to be a waiver because Nghiem initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a closing brief of fifty pages. (*Id*. at 1440.)  In other words, Nghiem participated in the arbitration on the merits of the underlying dispute; Claimant has not done the same here. (*See also Garcia v. Amazon.com Servs. LLC* (C.D. Cal. May 25, 2021) No. 2:21-CV-00604-SB-MRW, 2021 WL 2954088, at *4 ["But where the Ninth Circuit and courts therein have found no waiver despite a party's participation, there usually has been an immediate and ongoing objection to the arbitration or the participation was necessary to preserve the litigant's rights."].)[5]

---

[4] Respondent points to several places in the JAMS forms and instructions for filing a demand that ask the claimant to include a copy of the Parties' contract with an arbitration clause if applicable.  Stip. Facts ¶¶16-19.  The Parties stipulated that "To initiate the arbitration, Claimant submitted a copy of the Harbor Freight Terms and Conditions with the JAMS submission form."  Stip. Facts ¶18.  These various boilerplate phrases and forms necessary to be completed to initiate a JAMS arbitration apply generically to every case.  While submitting a copy of the TOUs with the Demand may be puzzling, it does not establish that this Claimant intentionally relinquished a known right.  To the contrary, Mr. Blazina's Demand carefully stated the opposite—it was being submitted "without waiver."

[5] In its Sur-Reply, Respondent argues that Claimant's failure to respond to Respondent's affirmative waiver defense in its initial arbitrability filing bolsters Claimant's waiver of his arbitrability objection.  Respondent also points to the fact that at the March 12, 2025 Preliminary conference, Harbor Freight's counsel also argued that Claimant

32.     Respondent argues that Claimant's approach – initiating arbitration to determine arbitrability and then, if arbitrability is found, submitting his substantive claims to be arbitrated – constitutes impermissible claims splitting.  Blazina, however, is not "hold[ing] back claims for relitigation in subsequent proceedings."  See Sur-Reply at 4-5.  Instead, in the Demand he asked that jurisdiction be determined here and now, and once that is decided, he plans to submit his claims on the merits either in this forum or in the courts.  While Claimant may need to amend his Demand if jurisdiction remains in arbitration, nothing at all will be relitigated.  This is not impermissible claim splitting.

33.     **Conclusion.**  On balance, the preponderance of the evidence presented in this unusual arbitration does not support the conclusion that Claimant Blazina agreed to enter the TOU Agreement presented on Respondent Harbor Freight's website.  The Arbitrator concludes that by initiating and pursuing this arbitration, Blazina has not waived, and is not estopped from asserting, his right to argue that he did not assent to arbitration with Respondent over the underlying dispute.  The Arbitrator, therefore, lacks jurisdiction over the underlying "cookies" dispute that is referenced in the Demand (but not yet asserted) under either of the Parties' jurisdictional theories.

34.     There is a preliminary and related issue—since the Arbitrator lacks jurisdiction to address the underlying "cookies" dispute, what is the basis for the Arbitrator's jurisdiction to decide the jurisdictional issue presented by the Demand itself?  As noted above (¶ 16) the Parties had apparently agreed that the Arbitrator should arbitrate "the threshold jurisdiction issue" raised by the demand.  But in his Reply brief, after noting that the parties may agree by contract that an arbitrator, rather than a court, will resolve **threshold arbitrability questions**, here "the parties have agreed to arbitrate the issue of whether they formed an agreement to arbitrate **other matters**" (i.e., the cookies dispute).  Reply at 4 (emphasis added).  But Claimant does not explain what, where, or how the Parties manifested that agreement to arbitrate.  He has strongly rejected the contention that he agreed to arbitrate by agreeing to the TOUs or by the act of pursuing his Demand.  Respondent, as also noted above, is insistent that the Parties agreed to arbitrate their entire dispute, including their "cookies" dispute—the very dispute that Claimant asserts he never agreed to arbitrate.  If the Arbitrator lacks jurisdiction over that "underlying" dispute due to a lack of agreement between the parties to arbitrate, does the Arbitrator also lack jurisdiction to rule on the threshold jurisdiction issue stated in the Demand?  In other words, aren't there two levels of jurisdictional questions raised—does the Arbitrator have jurisdiction to decide the (jurisdictional) issue raised in the Demand?

35.     On closer examination, therefore, while the Parties had both affirmatively represented to the Arbitrator that they agreed to arbitrate the narrow issue presented in the Demand, there was no true meeting of the minds.  There was thus no clear and unequivocal agreement between them to delegate to the Arbitrator the preliminary issue of jurisdiction to

---

consented to arbitration by voluntarily filing the Arbitration Demand. Respondent explains, Claimant "made the tactical choice to solely brief Claimant's experience on the website" in its initial arbitrability brief.  He did not respond to the waiver issue therein." (*See* Sur-Reply, p.5.) Claimant did affirmatively respond to the waiver argument in his Reply brief after it was raised in Respondent's Response to Claimant's Motion.  And Respondent responded to those arguments in its Sur-Reply.

9

decide the narrow issue stated in the Demand (that itself presents a separate jurisdictional issue). To the contrary, as the Arbitrator has concluded that there is no binding agreement to arbitrate the underlying cookies dispute, for the same reasons, the balance of the evidence does not support the conclusion that there was a meeting of the minds of the Parties establishing that they clearly and unequivocally delegated to the Arbitrator the threshold issue to decide jurisdiction over the Demand.

35.     It is therefore **ordered** that this arbitration is dismissed for lack of jurisdiction.

Dated:  July 17, 2025

Roderick M. Thompson
Arbitrator

10